**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SUSAN R. HUNTER, SARA A. FOGELMAN AND REBECCA A. MEIFERT | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| GLENN O. HAWBAKER, INC. AND CENTRE LIME AND STONE, INC. | : | No. 1473 MDA 2024 |

Appeal from the Order Entered May 20, 2024
In the Court of Common Pleas of Mifflin County Civil Division
at No(s): CP-44-CV-1121-2018

BEFORE: BOWES, J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY BOWES, J.:*     **FILED: JANUARY 28, 2026**

In this interlocutory appeal by permission, Susan R. Hunter, Sara A. Fogelman, and Rebecca A. Meifert (collectively "Plaintiffs") challenge the order that granted the motion for partial summary judgment filed by Glenn O. Hawbaker, Inc. ("GOH") as to Plaintiffs' claim for breach of contract.[1] We reverse and remand for further proceedings consistent with this memorandum.

Plaintiffs are successors in interest to parties who made what, in retrospect, was a bad deal. Plaintiffs have spent the past seven years litigating grounds to renegotiate, reform, or terminate agreements pertaining

---

* This case was reassigned to the author on November 21, 2025.

[1] Centre Lime & Stone, Inc. has not participated in this appeal.

to the mining of limestone from the Naginey quarry now operated by GOH.[2]

The trial court summarized the background as follows:

> Plaintiffs in this case are owners, through inheritance or otherwise, of rights in two parcels of land in Mifflin County which we will refer to as the "McClintic parcel" and the "Winegardner parcel", so named because of the mineral leases to which they are subject. The lease controlling the McClintic parcel (the "McClintic Lease") is dated April 14, 1930. The lease controlling the Winegardner parcel (the "Winegardner Lease") is dated November 5, 1913. The parties in this case are co-tenants in the surface and minerals rights as to the Winegardner parcel. While [GOH] is the fee owner, the parties have co-rights to the limestone royalties as to the McClintic parcel.

Trial Court Opinion, 5/20/24, at 1 (cleaned up, some articles omitted).

Pursuant to the Winegardner Lease, Plaintiffs' predecessors were entitled to $0.01 per ton of limestone mined and removed from the parcel, to be paid monthly along with a statement showing the royalties due. **See** Winegardner Lease at 1 (pagination supplied).[3] The agreement further provided that they would receive a $35 minimum monthly payment regardless of the amount of limestone mined in the preceding month. If $35 was more than a penny for each ton mined in a given term, the lessee was permitted to deduct the excess from future payments in months "when the royalties on the

_____

[2] According to GOH, five separate parcels comprise the open pit quarry, the mining of which is governed by two permits issued by the Pennsylvania Department of Environmental Protection ("DEP"). **See** GOH's Answer and New Matter, 10/15/21, at ¶ 11.

[3] The Winegardner Lease is included in the certified record as Exhibit C to Plaintiffs' September 21, 2018 complaint.

mineral actually mined and removed [were] in excess of the said sum of [$35], and then only for such excess." *Id*. In 1990, different predecessors to the interests of Plaintiffs and GOH amended the Winegardner Lease to redefine a ton as 2,000 pounds rather than 2,240 pounds, to raise the monthly minimum payment from $35 to $70, and to specify an increasing tonnage-based royalty of, *inter alia*, $0.15 per ton from April 2010 through March 2020, and $0.20 per ton thereafter until the end of March 2030.

The Winegardner Lease contains provisions for cancellation of the lease by the lessor or the lessee. The latter, which GOH became when it assumed the lease on September 1, 2015, retained broad rights to void the agreement upon delivering or recording written notice thereof, subject to the lessors' right to recover any royalties that accrued beforehand. The contract states as follows as to Plaintiffs' right to terminate the agreement:

> In case [GOH] shall fail to pay any of the moneys or royalties for the space of thirty days after the time the same should have been paid under the provisions of this agreement, [Plaintiffs] shall have the option to forfeit, cancel and make void this agreement provided he or they shall first give [GOH] a notice in writing declaring said forfeiture, and if [GOH] shall then pay up all moneys or royalties due within thirty days after receiving said notice, the said forfeiture and cancellation [shall not take effect and the agreement shall continue in force].

*Id*. at 2. If the agreement "is cancelled, becomes void as hereinbefore provided for, or is terminated in any manner," GOH nonetheless retains the right to maintain any rail lines traversing the parcel for $100 per year. *Id*.

The McClintic Lease, which has not been amended since it was executed in 1930, contained similar, but not identical, provisions. It called for the lessors to receive $0.01 per gross ton of 2,240 pounds of "all limestone quarried, mined, removed[,] and marketed" from the McClintic parcel, specifying that stone that was mined and stockpiled was subject to royalties only when removed and marketed. **See** McClintic Lease at 4.[4] It also had a $35 minimum royalty to be paid each month whether or not the corresponding amount of limestone was removed, with the following caveat:

> [I]f [GOH] shall, pursuant to the foregoing obligation, pay with to respect to any month or months royalties on more stone than shall have actually been quarried, removed[,] and marketed as aforesaid during such month or months, it shall be entitled to a credit . . . in any subsequent month or months in excess of the amount which at said rate of [$0.01] per ton would equal the minimum royalty for such subsequent month or months.

*Id*. at 5.

This lease detailed how the amount of stone attributable to the McClintic parcel was to be determined by reference to railroad scale weights or other scales if transported by truck or other means. *Id*. It further stated that when stone quarried from that parcel was mingled with stone quarried from other lands, the amounts originating from the respective parcels

> shall for all purposes of this lease be determined by apportioning the total weight of all stone shipped (ascertained from the railroad scale weights or otherwise as aforesaid) to the various lands from which stone is being quarried and removed on the basis of the

---

[4] The McClintic Lease is included in the certified record as Exhibit D to Plaintiffs' September 21, 2018 complaint.

number of quarry carloads of stone removed from such lands respectively to [GOH's] crushing plant; it being agreed by [GOH] that it will keep a true and accurate record of the number of quarry carloads of stone coming from said lands of [Plaintiffs] and from other lands, which records shall be open to the inspection of [Plaintiffs] at all reasonable times.

*Id*. at 5-6.

GOH had a unilateral right to terminate the McClintic Lease at the end of any quarter upon at least three months' notice, again with the option to pay $100 per year thereafter to maintain and use their rail lines. The procedure for Plaintiffs to void the McClintic Lease was stated as follows:

In case [GOH] shall default in the payment of any royalties or other moneys hereunder when and as the same shall be due and payable in accordance with the terms hereof, [Plaintiffs] may at their option give to [GOH] notice in writing calling attention to such default and unless such default shall be fully cured within sixty days thereafter, this lease may be terminated by [Plaintiffs] at any time after the expiration of such sixty days by notice in writing to [GOH] whereupon this lease and the estate hereby granted, together with all rights and privileges appertaining thereto shall be and become absolutely void and of no effect, and it shall and may be lawful for [Plaintiffs] at once to re-enter and take possession of the demised estate and to eject [GOH] therefrom; it being understood that such forfeiture and re-entry shall not preclude [Plaintiffs] from proceeding to recover any moneys due them in accordance with the provisions hereof by distraint or otherwise. It is expressly understood and agreed, however, that [GOH] shall not be considered in default because of non-payment of any royalties or other moneys so as to permit termination by [Plaintiffs] by reason of such non-payment if there shall be a dispute as to the proper amount due and payable and [GOH] shall have paid the amount by it admitted to be due[.]

*Id*. at 8 (cleaned up). Subject to cancellation or termination, the McClintic Lease remains in effect until all the limestone has been mined and removed from the parcel. *Id*. at 9.

- 5 -

On September 21, 2018, Plaintiffs and other lessors filed a complaint against GOH alleging that both leases were oppressively one-sided and provided for unconscionably low payments, given that a reasonable royalty of $0.62 per ton results from applying a typical five percent rate to the $12 per ton market value of crushed limestone. *See* Complaint, 9/21/18, at 10-12. Contending that the millions of tons of stone remaining on the parcels would take fifteen to thirty years to be depleted, Plaintiffs requested that the court either set aside the leases or reform them to reflect a fair royalty rate. *Id*. at 13. They further claimed as damages the difference between what GOH had paid and the fair rate, and sought an accounting and "all records used to determine what share of royalty was paid for stone from each of the properties" compared to other lands within the quarry. *Id*. at 11.

After the filing of the sheriff's return of service, the parties engaged in mediation such that there was no docket activity in the case until January 2021, when the prothonotary issued notice of proposed termination of the case. Plaintiffs, through new counsel, responded with a statement of intention to proceed, and GOH filed its answer and new matter.

On April 30, 2021, Plaintiffs sent to GOH a notice of default and intent to terminate the McClintic Lease. Therein, they stated that they had been informed by an unidentified source that GOH was observed "consistently removing and transporting substantial rock from the McClintic property" while

only paying the minimum royalty of $35 per month. **See** Brief in Support of Motion for Partial Summary Judgment, 10/19/21, at Exhibit B.

Shortly thereafter, Plaintiffs sought leave to file an amended complaint, contending that GOH's failure to act in good faith in negotiations for an out-of-court resolution, and its unrelated criminal indictment for failing to pay its employees in accordance with prevailing wage laws, left Plaintiffs with no confidence that GOH would properly report tonnage and royalties if the contracts were reformed. **See** Brief in Support of Motion for Leave to file Proposed Amended Complaint, 5/3/21, at 9-12. Therefore, Plaintiffs wished to abandon their request for reformation as an alternative to setting aside the agreements due to unconscionability, and to instead pursue an action for equitable partition of the real estate. **Id**. at Exhibit A.

Plaintiffs' motion was granted and their amended complaint filed. GOH filed preliminary objections asserting that Plaintiffs improperly omitted some parties from the caption of the amended complaint and failed to join Centre Lime & Stone Company, Inc. ("CL&S"), an indispensable party with implicated ownership interests. Plaintiffs then filed a motion to amend the complaint again to omit settled parties from the caption and to add CL&S, which the court granted.[5]

---

[5] The changes were a result of some plaintiffs to the original complaint settling with GOH and CL&S acquiring their interests in the leases. Our review of the certified record did not reveal the precise ownership of CL&S, but its pleadings
*(Footnote Continued Next Page)*

Before the pleadings were closed, Plaintiffs filed a first and a second motion for partial summary judgment. In the former, they contended that it was undisputed that GOH failed to pay the full royalties due under the McClintic Lease after notice was given and, therefore, the court should rule that it was terminated and issue an injunction prohibiting GOH from mining any more from the McClintic parcel. *See* Motion for Partial Summary Judgment, 10/19/21, at 7-13. In their second motion, Plaintiffs took the position that both leases should be declared terminated because they are impermissibly perpetual. *See* Second Motion for Partial Summary Judgment, 11/15/21, at 6-8.

GOH filed responses to the motions, asserting, *inter alia*, that Plaintiffs were seeking judgment on a breach of contract claim that they had not pled, that their request was procedurally defective in multiple respects, that there were disputed issues of material fact, and that the leases were expressly intended to continue until all the limestone was removed. *See* Response to Motion for Partial Summary Judgment, 11/24/21, at 3; Response to Second Motion for Partial Summary Judgment, 12/14/21, at 2. By order of May 10, 2022, the trial court denied both summary judgment motions, set a discovery deadline for October 31, 2022, and indicated that Plaintiffs could thereafter renew their motions.

---

were verified by D. Michael Hawbaker, who indicated in a deposition that CL&S has the same management as GOH.

Discovery proceeded, during which Plaintiffs sought court intervention to compel responses from GOH and CL&S. Following the piecemeal production of thousands of documents and the multi-part deposition of GOH representative James White, Plaintiffs again moved to amend their pleadings. Plaintiffs asserted that it was only through the compelled discovery that they obtained evidence to substantiate their suspicions that GOH was not paying the royalties due under the leases. In particular, they cited a spreadsheet and Mr. White's later deposition testimony about it which they claimed reflected an arbitrary allocation of royalties based upon Mr. White's discretion rather than the application of a consistent methodology to the stone actually quarried and sold from the various parcels. For example, they highlighted Mr. White's indication that stone shot from the Winegardner parcel, as reported by GOH to the DEP, was not included in royalty payments to Plaintiffs because GOH elected to use that stone to build ramps within the quarry rather than to sell it.

Based upon this newfound knowledge, Plaintiffs alleged that, at the time the original complaint was filed, more than 50,000 tons were improperly allocated to a parcel owned by GOH instead of to the McClintic parcel, and the Winegardner parcel was likewise shorted 55,000 tons. They maintained that, as of September 2022, GOH still owed royalties pursuant to the McClintic Lease for 47,000 tons, while the full amount had been paid on the Winegardner Lease, although well after the various payments had been due.

Plaintiffs also averred that GOH had failed to make the mandatory minimum payments of $35 and $70 each month from September 2022 through January 2023. Thus, they sought to file a third amended complaint, adding a count for breach of contract, seeking not to be paid outstanding royalties or interest thereon pursuant to the terms of the leases, but for the leases to be set aside and to be awarded damages in the amount of a reasonable royalty for stone marketed before partition. **See** Motion for Leave to File Third Amended Complaint, 3/6/23, at 6-9, 12.

The trial court granted Plaintiffs' motion by order of April 18, 2023, deeming the third amended complaint to be filed on that date.[6] GOH filed preliminary objections thereto contending, among other things, that Pennsylvania does not recognize unconscionability as a cause of action rather than a defense, and that Plaintiffs' breach of contract claim was premature because they did not give GOH notice and an opportunity to cure before injecting the cause of action into the law suit. Plaintiffs responded to the objections by noting that they had been unable to provide notice earlier because GOH withheld the necessary information despite Plaintiffs' pre-

_____

[6] Frustratingly, each of Plaintiffs' amended complaints did not present a complete snapshot of their claims moving forward, but incorporated enumerated paragraphs of prior versions by reference and only spelled out the new or different averments and requests for relief. Therefore, rather than being able to examine the third amended complaint to understand Plaintiffs' case at the time of the final amendment, one is required to examine four separate documents.

complaint requests, and that termination without an opportunity to cure was warranted in this case based upon our Supreme Court's holding in **LJL Transportation, Inc. v. Pilot Air Freight Corporation**, 962 A.2d 639 (Pa. 2009) (holding that a material breach may be so serious to allow immediate termination of a contract despite an express notice-and-cure provision). Plaintiffs further contended that, to the extent notice was required, GOH received it through Plaintiffs' motion for leave to amend the complaint to add the breach of contract count. Additionally, they argued that, while Pennsylvania had to date not recognized an affirmative claim of unconscionability, it was gaining traction in other jurisdictions and was warranted in this case.

The trial court sustained GOH's objections in part. Specifically, the court concluded that Pennsylvania does not recognize unconscionability as a cause of action and dismissed that count. The court declined to jettison the breach of contract claim, citing issues of fact. **See** Order, 8/23/23, at 1.

GOH then filed its answer and new matter. In addition to other averments not pertinent to this appeal, GOH denied that it had committed any breach of the leases, explaining that it did not make payments after August 2022 because in that month it had inadvertently overpaid Plaintiffs such that the amounts due in the following months had been satisfied in advance. GOH maintained its position that Plaintiffs had not provided the notice and opportunity to cure it believed a condition precedent to suing for breach of the

leases, and, in any event, any breach had been cured by the August 2022 overpayment.

Before CL&S filed its answer to Plaintiffs' latest complaint, and prior to answering GOH's new matter, Plaintiffs filed their third motion for partial summary judgment. Rather than reasserting the grounds the court had earlier denied without prejudice, Plaintiffs' sole basis for seeking judgment as a matter of law this time was GOH's alleged default in failing to pay royalties from September 2022 to April 2023. GOH responded to the motion by reiterating the issues it offered in opposing the amendment. It also argued that the third amended complaint could not be deemed proper notice because it did not declare forfeiture as mandated by the leases, and that Plaintiffs' motion was supported by "unverified narratives without citation" rather than evidence demonstrating their entitlement to judgment as a matter of law. *See* Response to Plaintiffs' Third Motion for Partial Summary Judgment, 11/30/23, at 3. The trial court denied Plaintiffs' motion by order of January 24, 2024, indicating that Plaintiffs' claim for breach of contract was premature. Contrasting cases cited by Plaintiffs involving the statutory notice provisions of Pennsylvania's Uniform Commercial Code, the court opined:

> In the kind of matter *sub judice* the breach of contract has not occurred until after there has been notice and a failure to cure. In other words, there is no basis for a lawsuit until after the notice procedure has been followed. To say that the filing of the lawsuit provides the notice for its prerequisite puts the cart decidedly before the horse.

Memorandum, 1/24/24, at 3.

On February 13, 2024, Plaintiffs sent GOH default notices pursuant to the respective provisions of the leases. In each notice, they cited as defaults: (1) GOH's failure to pay proper royalties from 2016 onward, as detailed in the third amended complaint; (2) its failure to pay monthly minimum royalties from September 2022 to April 2023, as detailed in the third amended complaint; and (3) its decision to stop paying royalties when the stone was quarried and removed in favor of paying as soon as the rock was blasted. **See** GOH Summary Statement, 4/5/24, at Exhibit A.

Before the expiration of the post-notice cure period, GOH filed its own motion for partial summary judgment on March 1, 2024. Therein, GOH asserted, in congruence with the trial court's January 24, 2023 memorandum, that Plaintiffs' breach of contract claim was premature, observing that "[c]ourts applying Pennsylvania law routinely enforce notice-and-cure provisions like the ones in the McClintic and Winegardner Leases." GOH's Motion for Partial Summary Judgment, 3/1/24, at 4 (citing **McWreath v. Range Res.--Appalachia, LLC**, 81 F.Supp.3d 448 (W.D. Pa. 2015), *aff'd*, 645 Fed.Appx. 190 (3d Cir. 2016)). It argued that our High Court's **LJL Transportation** decision was inapt due to differences in contract language and Plaintiffs' failure to adduce evidence of a material breach as opposed to minor, curable issues. **See** GOH's Brief in Support of Motion for Partial Summary Judgment, 3/1/24, at 16-18.

GOH also contended that the claim for breach of contract was moot because Plaintiffs' February 13, 2024 notices sought "to resolve the purported breaches outside of the [c]ourt by giving GOH the opportunity to cure[.]" GOH's Motion for Partial Summary Judgment, 3/1/24, at 6. Additionally, GOH asserted that Plaintiffs' count for an accounting was merely incident to their claim for breach of the leases, such that it should be dismissed along with the contract count. *Id*. at 3.

In response, Plaintiffs reiterated the arguments about their ability to timely address GOH's breaches by providing the notice proscribed in the leases being thwarted by GOH's "years-long obstructionist behavior, . . . denying Plaintiffs access to information they needed to determine whether they were being paid correctly under the terms of the leases." Response in Opposition to GOH's Motion for Partial Summary Judgment, 3/15/24, at 2. They supported this allegation with the affidavit of Susan R. Hunter, who attested that she and her sister, Sara A. Fogelman, "made multiple requests to GOH on behalf of Plaintiffs for documentation establishing the basis for the monthly royalty statements provided by GOH[,]" but that "GOH never provided the requested documentation prior to the filing of suit by us against GOH." *Id*. at Exhibit C. Plaintiffs contended that GOH could not hide its breaches then complain that it did not have notice opportunity to cure them.

Plaintiffs further asserted that they had provided GOH with notice of their allegations of breach and their intent to terminate the leases multiple

times after compelled discovery disclosed them, dating back to their March 6, 2023 motion for leave to amend the complaint to assert their claim for breach of contract. Plaintiffs maintained that the trial court erred insofar as it determined that the provision of notice was a condition precedent for initiating a claim for breach of the leases. They observed that, unlike the contracts at issue in the cases proffered by GOH, such as *McWreath*, neither the Winegardner Lease nor the McClintic Lease specified a requirement that notice precede litigation. *Id*. at 9-12. Plaintiffs posited that, since the breaches were discovered or occurred while the case was already pending, and GOH suffered no unfair prejudice because it still had the ability to cure during the litigation but did not, GOH was not entitled to prevail as a matter of law purely on the basis of the absence of pre-complaint notice. *Id*. at 18.

At oral argument on GOH's motion, the court initially focused on whether there were any disputed facts to be resolved by the jury. Plaintiffs pointed to the issues of whether GOH had made it impossible for them to earlier comply with the leases' notice provisions and whether GOH had cured the defaults as it alleged to have done. *See* N.T. GOH Motion for Summary Judgment, 4/10/24, at 26-28. GOH again insisted that the notice and cure mechanisms of the leases provided the only means for Plaintiffs to terminate them, and there was no question that Plaintiffs failed to give the requisite notice before filing for breach. *Id*. at 31-35. Upon questioning by the court, GOH indicated that even if it lied and falsified records, but then cured after Plaintiffs supplied

- 15 -

notice that they discovered the deception, their remedy was "to file suit for fraud, but they wouldn't be able to say breach of lease forfeiture." *Id*. at 58.

For its part, the trial court reiterated its opinion that Plaintiffs' claim for breach of the leases did not ripen until after it gave GOH notice and it failed to cure, such that if Plaintiffs believed that GOH was still in default thirty and sixty days after they supplied their February 2024 notices, they had to file a new lawsuit at that time. *Id*. at 21-22. However, the court directed Plaintiffs to submit evidence in addition to Susan Hunter's affidavit supporting their claim that GOH obstructed their ability to give notice. *Id*. at 61.

Plaintiffs produced documents detailing their efforts, beginning in June 2017, to obtain explanations from GOH for its royalty payments, including letters sent to GOH and the necessity for them to initiate these proceedings to obtain an accounting because GOH was uncooperative. *See* Proffers, 4/25/24, at 1-2. Plaintiffs also produced evidence that, viewed in the light most favorable to Plaintiffs, reflected GOH's perceived bad faith in the post-complaint mediation process and its "game" playing such as responding to Plaintiffs' 2021 default notice by asking for factual support for the claimed default while still withholding access to the information they required to supply it. *Id*. at 3-4. Plaintiffs further referenced the two years of formal discovery that was necessary for them to finally learn that GOH was paying royalties at Mr. White's whim rather than based upon the actual, documented sale of stone sold that month from each parcel. *Id*. at 4-5.

On May 20, 2024, the court entered a memorandum and an order granting GOH's motion, referencing its reasoning in the memorandum denying Plaintiffs' third motion for partial summary judgment.[7] The court acknowledged that it had "not infrequently observed during arguments in this case, that [P]laintiff[s'] ability to become aware of a default is hampered by their lack of ready access to appropriate records." Memorandum and Order, 5/20/24, at 4. Although only the McClintic Lease contained an entitlement for Plaintiffs to review GOH's records, the court indicated that the "lease agreements," plural, "do guarantee [P]laintiffs' access to the records for their inspection." *Id*. The court further stated on this subject:

> [W]e could foresee a situation where the Plaintiffs, faced with the leases *sub judice*, could argue that [GOH] engaged in such purposefully obstructive behavior so as to excuse the notice requirement. The leases in this case, while making the notice of a default a prerequisite of termination, also provide that it is incumbent upon [GOH] to make its records open for inspection. Conceivably, the purposeful obstruction of the right of inspection of [GOH]'s records, or purposeful and fraudulent manipulation of its data, could operate to excuse the Plaintiffs from anything other than a general averment of default. Neither side to this litigation has provided us with any legal authority on that question. Even assuming, however, that the duplicity of a [d]efendant could rise to such a level, at least warranting the submission of the question to a jury, there is no evidence of such wrongdoing in the record of this case.

*Id*. at 6.

---

[7] The court dismissed GOH's motion for judgment on the accounting claim, indicating that it did not brief or argue that aspect of the motion. *See* Memorandum and Order, 5/20/24, at 8.

Plaintiffs requested that the court certify its order for an interlocutory appeal, which the court granted by order of June 17, 2024. Plaintiffs timely filed a petition for permission to appeal, which a motions panel of this Court granted by order of October 10, 2024.[8]

Plaintiffs present the following issues for our interlocutory review:

1. In concluding that [GOH] was entitled to summary judgment as a matter of law, did the trial court err in dismissing [Plaintiffs'] breach of contract claim on the ground that a precondition for filing such a claim is that the claimant must notify the counter-party of the breach and provide it a right to cure before the claim can be made in a lawsuit, regardless of whether or not pre-suit notice is required by the language of the contract in question?

2. Similarly, did the trial court err in the same way in ruling that a subsequent separate written notice sent in February 2024 after another alleged breach of contract also failed to satisfy the alleged notice requirement?

3. Alternatively, did the trial court err by treating as an issue of law rather than an issue of fact whether [Plaintiffs'] claim of impossibility of performance due to their inability to obtain information about the contractual breaches in the sole possession, custody and control of [GOH], negated any notice requirement [Plaintiffs] might otherwise have had?

_____

[8] The trial court did not order Plaintiffs to file a Pa.R.A.P. 1925(b) statement, and none was filed. The court submitted a Rule 1925(a) statement incorrectly stating that the denial of Plaintiffs' summary judgment motion was at issue in this appeal, yet nonetheless pointing us to its apt May 2024 memorandum and order disposing of GOH's motion for partial summary judgment. **See** Memorandum Pursuant to Pa.R.A.P. 1925(a), 10/17/24, at 2.

Plaintiffs' brief at 9.[9]  Although they state three questions, we perceive that Plaintiffs' position is, at bottom, that the court should have allowed their breach of contract claim to continue because they gave GOH all the notice that they were due.

Before considering the substance of these issues, we address GOH's arguments that the instant appeal is untimely and improper.  Specifically, GOH asserts that, to obtain interlocutory review of the court's ruling that the provision of notice and an opportunity to cure was a precondition to suing for breach of contract, Plaintiffs were required to seek permission to appeal the first order that reached it, namely the January 23, 2024 order denying

_____

[9] While Plaintiffs filed their appellate brief in accordance with this Court's schedule, they did not designate or file a reproduced record in accordance with Pa.R.A.P. 2154 and 2186.  GOH moved to dismiss the appeal on that basis pursuant to Pa.R.A.P. 2188, which we denied without prejudice.  GOH renewed the motion after the appeal was assigned to the instant panel such that we address it before considering the appellate issues raised by Plaintiffs.

We have explained:  "Compliance with the Pennsylvania Rules of Appellate Procedure . . . regarding contents of reproduced records on appeal is mandatory, not directory.  This Court will quash an appeal when the appellant's violations substantially impede the appellate process." **Fulano v. Fanjul Corp.**, 236 A.3d 1, 12 (Pa.Super. 2020) (cleaned up).  Conversely, when the Rules violations do not substantially encumber review, we may decline to refuse merits review.  **Id**.

While we conclude that our review has been rendered more time-consuming by Plaintiffs' failure to comply with the rules, we do not deem the impediment substantial enough to warrant the extreme sanction of dismissal. **Accord Rush v. Philadelphia Newspapers, Inc.**, 732 A.2d 648, 651 n.1 (Pa.Super. 1999) (denying a motion to dismiss due to the appellant's failure to file a reproduced record because its absence did not hamper review of the issues).  Therefore, we deny GOH's renewed motion to dismiss.

Plaintiffs' third motion for partial summary judgment. *See* GOH's brief at 22-24. GOH further argues that the doctrine of judicial estoppel precludes Plaintiffs from now arguing that their third amended complaint served as the requisite notice of default because they earlier took the position that it was impossible to provide notice. *See* GOH's brief at 24-26.

Addressing the latter point first, GOH's judicial estoppel argument is plainly specious. "The purpose of the judicial estoppel doctrine is to uphold the integrity of the courts by preventing parties from abusing the judicial process by changing positions as the moment requires." *McWilliams v. McWilliams*, 324 A.3d 602, 610 (Pa.Super. 2024) (cleaned up). Critically, it is well-settled that "judicial estoppel is properly applied only if the court concludes the following: (1) that the appellant assumed an inconsistent position in an earlier action; and (2) that the appellant's contention was successfully maintained in that action." *Id*. (cleaned up). Here, Plaintiffs neither successfully maintained in a prior proceeding that providing notice was impossible, nor subsequently took an inconsistent position. Rather, when adding their claim for breach of contract and contending that its pleading satisfied the termination mechanisms of the leases, Plaintiffs pled that they could not have provided notice earlier based upon GOH's control of the requisite information, not that notice continued to be impossible after GOH was compelled to disclose their records. Accordingly, judicial estoppel is in no way implicated here.

We are also wholly unpersuaded that Plaintiffs' failure to seek interlocutory review of the order denying their third motion for partial summary judgment renders the instant appeal improper. Even assuming that the prior interlocutory order became the law of the case binding the trial judge in considering the second interlocutory order now before us,[10] this Court recently made it plain that waiting for a subsequent ruling may inform our adjudication of a petition for permission for an interlocutory appeal, but is of no moment once we have granted review.

Specifically, in **Brader v. Allegheny Health Network**, ___ A.3d ___, 2025 WL 3456422 (Pa.Super. Dec. 2, 2025), one judge on preliminary objections made a ruling as to the applicable statute of limitations, and a second judge six years later likewise resolved that legal issue against the defendant in denying summary judgment. The defendant filed a petition for permission to appeal asking this Court to review the later order, and we granted it. We noted that the defendant offered no explanation why it did not pursue interlocutory review when the ruling was first made, and admonished the tardiness, observing that "[d]elaying seeking review causes judicial resources to be wasted and undermines the expectations of the other party."

---

[10] The law of the case doctrine "refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court or by a higher court in the earlier phases of the matter." **Commonwealth v. Starr**, 664 A.2d 1326, 1331 (Pa. 1995). It does not restrict a jurist's ability to reconsider his or her own non-final prior ruling.

*Id*. at *6 n.11. We cautioned that this Court might "be less likely to permit an interlocutory appeal if we surmise that the petitioner is manipulating the timeliness requirements for seeking such interlocutory review." *Id*. Despite the defendant's failure "to seek our interlocutory review of these controlling questions of law at the first opportunity to do so," we abided by the decision of a motions panel of this Court to grant review of the later order because it was not "clearly erroneous." *Id*. (citing, *inter alia*, **Basile v. H&R Block, Inc.**, 973 A.2d 417, 422 n.6 (Pa. 2009) (acknowledging that the failure to seek an earlier interlocutory appeal by permission does not result in waiver "because to find waiver would create a 'self-contradictory **mandatory**, permissive interlocutory appeal'") (citation omitted; emphasis in original)).

Here, a motions panel of this Court opted to grant Plaintiffs' petition for permission to appeal an order filed mere weeks, not years, after the court's initial opinion indicating that they could not file a claim for breach of contract until after they provided GOH with notice and GOH failed to timely cure. We discern no basis to overrule that panel's decision. Thus, this appeal is properly before us.

Having disposed of these preliminary matters, we turn to the substance of Plaintiffs' challenges to the trial court's holding that GOH was entitled to summary judgment on the claim for breach of contract. The following legal principles govern our consideration of these matters:

In reviewing an order granting summary judgment, our scope of review is plenary, and our standard of review is the same as that applied by the trial court.

An appellate court may reverse the entry of a summary judgment only where it finds that the lower court erred in concluding that the matter presented no genuine issue as to any material fact and that it is clear that the moving party was entitled to a judgment as a matter of law. In making this assessment, we view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. As our inquiry involves solely questions of law, our review is *de novo*.

Thus, our responsibility as an appellate court is to determine whether the record either establishes that the material facts are undisputed or contains insufficient evidence of facts to make out a *prima facie* cause of action, such that there is no issue to be decided by the fact-finder. If there is evidence that would allow a fact-finder to render a verdict in favor of the non-moving party, then summary judgment should be denied.

***Sampathkumar v. Chase Home Fin., LLC***, 241 A.3d 1122, 1144 (Pa.Super.

2020) (cleaned up).

Rule 1035.2, which governs motions for summary judgment, provides

as follows:

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

(1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

(2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of

- 23 -

> action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.Civ.P. 1035.2. In sum, before a court is permitted to enter judgment as a matter of law rather than allow the jury to decide the case, it must be clear and free from doubt that there is no combination of facts to be gleaned from the evidence that would support a finding for the non-moving party. *See*, *e.g.*, *Braswell v. Wollard*, 243 A.3d 973, 977 n.3 (Pa.Super. 2020) ("Summary judgment will be granted only in those cases which are free and clear from doubt. Where the facts can support conflicting inferences, it cannot be said that the case is free from doubt and thus ripe for summary judgment." (cleaned up)).

Here, the trial court entered judgment as a matter of law in favor of GOH on Plaintiffs' claim for breach of contract upon concluding that the leases each required Plaintiffs to provide notice and an opportunity to cure before they may initiate a claim for breach of contract seeking the remedy of termination. Hence, we are presented first and foremost with a question of contract interpretation.

As our Supreme Court succinctly summarized: "The whole point of contract law is to effectuate the intent of the parties." *Glover v. Junior*, 333 A.3d 323, 355 (Pa. 2025). In this vein:

> When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent. The language of a contract is unambiguous if we can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the

- 24 -

language in general, its meaning depends. When terms in a contract are not defined, we must construe the words in accordance with their natural, plain, and ordinary meaning. As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used.

On the contrary, the terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense. Additionally, we will determine that the language is ambiguous if the language is obscure in meaning through indefiniteness of expression or has a double meaning. Where the language of the contract is ambiguous, the provision is to be construed against the drafter.

***Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare***, 299 A.3d 937, 983–84 (Pa.Super. 2023) (cleaned up).

In moving for summary judgment on Plaintiffs' contract claim, GOH noted that the Winegardner Lease and the McClintic Lease each has a notice-and cure provision. Relying on federal court cases such as ***McWreath*** and ***Linder v. SWEPI, LP***, 1:11-CV-1579, 2013 WL 521898 (M.D.Pa. Feb. 11, 2013), *aff'd*, 549 Fed.Appx. 104 (3d Cir. 2013), GOH suggested that any notice-and-cure term necessarily establishes "a condition precedent which must be met prior to even filing a lawsuit and if plaintiffs fail to fulfill such provisions, their claim should be dismissed." GOH's Brief in Support of Motion for Partial Summary Judgment, 3/1/24, at 11 (cleaned up).

The trial court agreed that no breach of contract claim could be initiated by Plaintiffs until notice had been given and the time for cure had elapsed, stating:

> Both of the leases in this case rather clearly provide that, before the Plaintiffs may terminate or seek forfeiture of the lease, **or, in our view, seek same in a court of law**, there must have been a written notice of default and a failure on the part of [GOH] to cure the default. Because this is a clear requirement in both leases[,] it is an element of proof necessary at trial to grant relief to the Plaintiffs.

*See* Memorandum and Order, 5/20/24, at 3 (emphasis added). The emphasized aspect of the above interpretation appears to stem not from the language used in each lease detailing the respective notice-and-cure procedures, nor by comparing their terms with those at issue in GOH's cited authority, but because "[i]n the kind of matter *sub judice* the breach of contract has not occurred until after there has been notice and a failure to cure." Memorandum and Order, 1/24/24, at 3. Since Plaintiffs added their breach of contract claim before this condition precedent had occurred, it necessarily failed, and could not be cured by the subsequent issuance of notice. *See* Memorandum and Order, 5/20/24, at 5-6.

Plaintiffs argue that the trial court erred in so holding because the cases cited by GOH are inapposite due to material differences in the language employed. *See* Plaintiffs' brief at 17-18. They further maintain that the trial court's creation of a general requirement, independent of the actual terms of the contract, that a party must exhaust a notice-and-cure mechanism before filing a breach of contract claim lacks support in Pennsylvania law. *Id*. at 18-19. Plaintiffs insist that the notice mandate should be excused under the circumstances, but, if notice was necessary, they provided it to GOH through

their third amended complaint, noting that "there is little sense in requiring the non-breaching party to bring an entirely new breach of contract action just so it could be preceded by a separate notice." *Id*. at 27-28.

For its part, GOH asserts that Plaintiffs "fail to explain how the lower court erred in construing the clear terms of the Leases to hold that compliance with the notice and cure provisions was required prior to their filing of their breach of contract claim and summary judgment was appropriate." GOH's brief at 34. It further argues that, even if the notice-and-cure procedure was not a prerequisite to filing their claim for breach, summary judgment was still properly granted because Plaintiffs did not come forth with evidence to prove their right to terminate the leases because: (1) the allegations of the third amended complaint itself do not satisfy the notice requirements of the leases, *id*. at 35-36; (2) all purported breaches had been cured at the time the breach of contract claim was filed, *id*. at 37-38; and (3) the February 14, 2024 notice letters mooted the claims for breach by offering to resolve any outstanding disputes out of court, leaving Plaintiffs, if still unsatisfied, with the right "to seek forfeiture in a new and separate action and GOH is entitled to test [their] claim with motions and discovery." *Id*. at 40.

We begin by re-examining the language of the leases, starting with the terse provisions of the Winegardner Lease:

> In case [GOH] shall fail to pay any of the moneys or royalties for the space of thirty days after the time the same should have been paid under the provisions of this agreement, [Plaintiffs] shall have the option to forfeit, cancel and make void this agreement

provided he or they shall first give [GOH] a notice in writing declaring said forfeiture, and if [GOH] shall then pay up all moneys or royalties due within thirty days after receiving said notice, the said forfeiture and cancellation [shall not take effect and the agreement shall continue in force[11]].

Winegardner Lease at 2 (pagination supplied).  Meanwhile, the McClintic Lease states more elaborately:

> In case [GOH] shall default in the payment of any royalties or other moneys hereunder when and as the same shall be due and payable in accordance with the terms hereof, [Plaintiffs] may at their option give to [GOH] notice in writing calling attention to such default and unless such default shall be fully cured within sixty days thereafter, this lease may be terminated by [Plaintiffs] at any time after the expiration of such sixty days by notice in writing to [GOH] whereupon this lease and the estate hereby granted, together with all rights and privileges appertaining thereto shall be and become absolutely void and of no effect, and it shall and may be lawful for [Plaintiffs] at once to re-enter and take possession of the demised estate and to eject [GOH] therefrom; it being understood that such forfeiture and re-entry shall not preclude [Plaintiffs] from proceeding to recover any moneys due them in accordance with the provisions hereof by distraint or otherwise.  It is expressly understood and agreed, however, that [GOH] shall not be considered in default because of non-payment of any royalties or other moneys so as to permit termination by [Plaintiffs] by reason of such non-payment if there shall be a dispute as to the proper amount due and payable and [GOH] shall have paid the amount by it admitted to be due[.]

McClintic Lease at 8 (cleaned up).

The plain language of each contract calls for its termination upon the expiration of the respective time for GOH to cure following the provision of

---

[11] This portion of the lease is mostly illegible in every copy we have located within the certified record.  However, our ruling does not turn upon the precise terminology of this aspect of the notice-and-cure provision.

notice without mention of any need for litigation to finalize its demise. More particularly, the Winegardner Lease allows Plaintiffs to declare forfeiture upon GOH's default and gives GOH thirty days to cure and thereby prevent that forfeiture from becoming permanent. The McClintic Lease conversely requires Plaintiffs to merely bring a default to GOH's attention and, if they do not cure within sixty days, Plaintiffs' notice of termination at any time thereafter renders the contract absolutely void, leaving them the option to go to court not to finalize the forfeiture, but to recover damages for non-payment prior to termination.

Notably absent from either lease is any specific form for the termination notice or an admonition that Plaintiffs shall not file a lawsuit against GOH unless and until they have given GOH an opportunity to cure. This is in marked contrast to the terms of the leases in the federal cases upon which GOH founded its summary judgment motion. For example, the instrument in *Linder* contained the following language:

> LIMITATION OF FORFEITURE. The Lease shall never be subject to a civil action or other proceeding to enforce a claim [for f]orfeiture due to Lessee's alleged failure to perform as specified herein, unless Lessee has received written notice of Lessor's demand and thereafter fails or refuses to satisfy Lessor's demand within [sixty] days from the receipt of the notice.

*Linder*, 2013 WL 521898, at *7. In *McWreath*, the contract detailed that the notice must be sent to a certain address by certified mail and addresses litigation thusly:

> Service of the Notice shall be precedent to the bringing of any action by Lessor on this Lease for any cause, and Lessor shall bring no such action until the lapse of sixty days after service of the Notice on Lessee. In the event a matter is litigated and there is a final judicial determination that a breach or default occurred, this Lease shall not be forfeited or cancelled in whole or in part unless Lessee is given a reasonable time after such final judicial determination to remedy the breach or default and Lessee fails to do so. Notwithstanding anything to the contrary contained in this Lease, this Lease shall not terminate or be subject to forfeiture or cancellation if there is located on lands pooled, unitized, or combined with all or a portion of the Leasehold, a well capable of producing oil and/or gas, or on which Operations are being conducted and, in that event, Lessor's sole remedy for any default under this Lease shall be damages.

*McWreath*, 81 F.Supp.3d at 454 (cleaned up).

The parties in *Linder* and *McWreath* thus plainly manifested an intent that the contractual notice-and-cure procedure be exhausted before litigation may commence. There is simply nothing in the leases at issue in this case remotely similar to that language. Indeed, the terms of the leases *sub judice* are more akin to those at issue in *Glover v. EQT Corporation*, 5:19-CV-223, 2020 WL 13094071 (N.D.W.Va. June 1, 2020), which stated:

> Lessor shall not declare Lessee in default under any provision of this Agreement, unless Lessor shall first notify Lessee in writing at the addresses above of Lessor's intention to declare such a default, which shall specify the nature of the default in detail, and Lessee fails to cure said default within thirty days after receipt of said notice.

*Id*. at *4 (cleaned up). When the plaintiffs sued for breach of the lease, the defendants moved for summary judgment, contending the claim for breach "must be dismissed for failure to satisfy a condition precedent to filing suit." *Id*. Citing *McWreath* and other federal district court decisions from

Pennsylvania and West Virginia, the defendants insisted that notice-and-cure clauses, generally speaking, are strictly enforced and rendered the claim in *Glover* premature. *Id*. Rather than looking at the results in these types of cases, the court considered the operable language in discerning the parties' intent, and found *McWreath* and the other cases distinguishable:

> The applicable provisions of the leases involved in the above cases were clear that compliance was a condition precedent. [*See*] *Stricklin v. Fortuna Energy, Inc.*, [2014 WL 2619587, at *2 (N.D. W.Va. June 12, 2014)] ("Service of the Notice shall be precedent to the bringing of any action by Lessor on this Lease for any cause and Lessor shall bring no such action until the lapse of sixty days after service of the Notice on Lessee"); *Chambers v. Chesapeake Appalachia, L.L.C.*, [2018 WL 3387997, at *3 (M.D. Pa. July 12, 2018)] ("The service of said notice shall be precedent to the bringing of any action by Lessor on said lease for any cause, and no such action shall be brought until the lapse of thirty days after service of such notice on Lessee"); *Addison v. CNX Gas Co., LLC*, [2011 WL 4553090, at *2 (W.D. Pa. May 13, 2011)] ("No litigation shall be initiated by Lessor with respect to any breach or default by Lessee hereunder, for a period of at least [ninety] days after Lessor has given Lessee written notice fully describing the breach or default[.]").

*Id*. (cleaned up). Meanwhile, the court found the terms of the Glover lease to be "somewhat unclear," citing an ambiguity about how the plaintiffs were to declare a default that had to be construed against the defendants. *Id*.

Ultimately, the *Glover* court found "that the defendants [we]re attempting to place form over substance, perhaps to delay the progress of this proceeding[,]" and listed what would happen if it granted their summary judgment motion:

> If this court were to dismiss the Glovers' complaint, the dismissal would be without prejudice.

The plaintiffs would have provided the notice, as the same was received by defendants [during the pendency of the case].

The plaintiffs would immediately file a new case.

The plaintiffs would then move to consolidate.

There would be no statute of limitations ramifications[.]

The only thing to be gained is delay.

*Id*. at *5 (cleaned up). Accordingly, the court denied the motion to grant summary judgment as to the breach of contract claim.

Looking at the actual language used in the Winegardner and McClintic Leases, we like the **Glover** court discern no manifestation of an intention to make the notice-and-cure procedure a condition precedent to suing for breach of the contract such that the count had to be dismissed and re-filed. Hence, the trial court's conclusion that both leases established conditions precedent to be fulfilled before Plaintiffs could resort to litigation, in the absence of any textual support for that view, was an error of law.

Instead, we conclude that Plaintiffs' declaring default and bringing the default to GOH's attention while the contract count was pending sufficiently satisfied their obligations under the leases and defeated GOH's form-over-substance argument. As we have painstakingly detailed *supra*, the certified record establishes that GOH was made aware, long before it filed its summary judgment motion, that Plaintiffs deemed it to be in default and sought to terminate both leases. GOH claims that it cured the breaches after Plaintiffs

litigated this action for years and obtained the information necessary to flesh out their default suspicions, while Plaintiffs maintain that the breaches have not been cured. This is a factual issue that may not be decided at summary judgment.

Moreover, this wrangle-the-proof-out-of-us-and-then-we-will-pay-you dynamic highlights another reason summary judgment is inappropriate in this case. Plaintiffs have been asserting since at least 2021 that GOH's conduct has left them with no confidence that GOH will accurately allocate and calculate royalties. *See*, *e.g.*, Brief in Support of Motion for Leave to file Proposed Amended Complaint, 5/3/21, at 9-12. They contend that they should not be required to expend the extensive resources that it has taken to uncover what they claim to be no fewer than fifty breaches over seven years to monitor GOH's compliance with their contractual obligations. *See*, *e.g.*, N.T. Leave to Amend Complaint, 4/18/23, at 4-6; Proffers, 4/25/24, at 1-5.

The trial court itself observed the difficulty Plaintiffs had in accessing the records necessary to determine whether GOH was paying them properly. *See* Memorandum and Order, 5/20/24, at 4. Moreover, the court elicited from GOH's counsel its position that GOH could intentionally cheat Plaintiffs by lying and falsifying records and nonetheless preclude Plaintiffs from terminating the leases by simply curing any defaults they eventually are able to discover. *See* N.T. GOH Motion for Summary Judgment, 4/10/24, at 58. Yet, while the court was able to "foresee a situation" in which GOH engaged in such fraudulent or

"purposefully obstructive behavior so as to excuse the notice requirement[,]" it perceived that neither party cited legal authority to support that, and, in any event, "there is no evidence of such wrongdoing in the record of this case." Memorandum and Order, 5/20/24, at 6.

However, as our procedural history documented, both Plaintiffs and GOH discussed **LJL Transportation** at various points in the proceedings. In that case, our High Court was "called upon for the first time to consider whether a party's conduct in breaching a contract may justify its immediate termination, even if the contract includes an express provision granting the breaching party the right to cure before the contract is terminated." **LJL Transportation**, 962 A.2d at 641. LJL was a franchisee of Pilot, a company engaged in air-freight forwarding through a network of freight stations throughout the country. Pursuant to LJL's agreement with Pilot, LJL was required to place all shipments through Pilot's system and was forbidden from conducting other business at the franchise location or delivering freight under another carrier's name. However, LJL's owners created a separate trucking company to compete with Pilot and systematically diverted shipments to that company to increase profits by avoiding Pilot's franchise fee and the profit-splitting elements of the contract. When Pilot discovered LJL's malfeasance, it sent a letter indicating that it was terminating the agreement.

LJL sued Pilot, admitting to the breaches but asserting that it had a right under the contract to cure them and avoid termination. *Id*. at 643 ("This

Agreement immediately terminates upon receipt by [LJL] of written notice of termination from Pilot. Pilot shall allow [LJL] an opportunity to cure a default within ninety days of receipt of written notice of a particular default." (cleaned up)). The trial court granted summary judgment to Pilot, holding that LJL "had no right to cure due to the dishonest and untrustworthy nature of their actions." *Id*. at 644 (cleaned up). This Court affirmed, ruling that "there are circumstances where the nature of the breach permits the aggrieved party to immediately terminate the contract despite a 'cure' provision" *Id*. at 645. We spurned LJL's argument that it "had an absolute right to cure any default, noting it was rejected by the trial court, and has been rejected by every other state that has considered it, and we reject it as well." *Id*. (cleaned up). The Pennsylvania Supreme Court affirmed our decision, summarizing its holding as follows:

> [W]e have no difficulty in concluding that when there is a breach of contract going directly to the essence of the contract, which is so exceedingly grave as to irreparably damage the trust between the contracting parties, the non-breaching party may terminate the contract without notice, absent explicit contractual provisions to the contrary.[12] . . . [R]equiring such notice before termination

_____

[12] GOH's position is that **LJL Transportation** is inapposite because the notice-and-cure term of the contract in that case was not the exclusive remedy available for a breach. **See** GOH's Brief in Support of Motion for Partial Summary Judgment, 3/1/24, at 16-18. However, in holding that a party may immediately terminate a contract in the event of an incurable breach, our High Court cited, *inter alia*, authority indicating that "[u]nder general contract law principles, . . . a contractual provision requiring an opportunity to cure does not bar immediate termination based on a breach that goes to the essence of the contract." **LJL Transportation**, 962 A.2d at 651 (quoting Jason J. Stover, *(Footnote Continued Next Page)*

- 35 -

under such circumstances would be a useless gesture, as such a breach may not reasonably be cured. Such a breach is so fundamentally destructive, it understandably and inevitably causes the trust which is the bedrock foundation and veritable lifeblood of the parties' contractual relationship to essentially evaporate. We find our law does not require a non-breaching party to prolong a contractual relationship under such circumstances.

*Id*. at 652 (cleaned up).

Here, Plaintiffs have alleged that GOH engaged in a years-long, deliberate scheme to falsely allocate blasted stone to different parcels within the quarry and to divert royalties to other parties. Unlike the franchisee in *LJL Transportation*, GOH denies Plaintiffs' accusations, maintaining that there are reasonable explanations for discrepancies among the various records and reports and that any breaches are not only curable but have been cured. That removes the instant case not from the ambit of our High Court's *LJL Transportation* holding, but from resolution at the summary judgment stage, given the factual disputes left to be resolved.

In sum, it may be that GOH has acted in good faith in performing its contractual obligations and that Plaintiffs' claims for breach may ultimately

---

*No Cure, No Problem: State Franchise Laws and Termination For Incurable Defaults*, 23 American Bar Association Franchise Law Journal 217, at 220 (Spring 2004)). This legal maxim is available "for incurable breaches that frustrate the purpose of the parties' contract," which includes material breaches that are incapable of cure, "even if the contract requires that an opportunity to cure be given for all breaches, without exception[.]" *Id*. We do not perceive the leases at issue to contain explicit provisions mandating a right to cure incurable breaches.

fail. However, our review of the certified record in the light most favorable to Plaintiffs as the non-moving party reveals that the non-viability of their breach of contract claim is by no means clear and free from doubt. Issues of fact remain regarding whether GOH has (1) cured all defaults for which they have received notice, or (2) committed such a serious, incurable breach that termination without a right to cure is warranted. Consequently, the trial court erred in holding that GOH was entitled to judgment as a matter of law because Plaintiffs failed to give notice and an opportunity to cure before amending their complaint to state a claim for breach of contract.

Order reversed. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judge Olson joins this Memorandum.

Judge Sullivan notes dissent.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/28/2026

- 37 -